IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RICHARD G. BEHNE, JR. and     :
BARRY KELLER,     :
                  :     CIVIL No. 1:13-CV-0056
       **Plaintiffs**     :
                  :
       **v.**     :
                  :
TAMI HALSTEAD; LORRIE     :
NULTON; JASON EHRHART;     :
JAMES PRESCOTT; THOMAS     :
FITZPATRICK; and the     :
BOROUGH OF NEWPORT,     :
                  :     **Judge Sylvia H. Rambo**
       **Defendants**     :

**M E M O R A N D U M**

In this civil action, former borough police officers assert various federal and state causes of action against the borough and a number of its current and former council members relating to Defendants' actions in disbanding the borough's police force. Presently before the court is Defendants' motion for summary judgment. For the reasons that follow, the motion will be granted in part and denied in part.

**I.**     **Background**

    **A.**     **Factual Background**[1]

On October 16, 2012, the Newport Borough Council voted three-to-two to disband the Newport Police Department, effective immediately, thereby terminating the positions of the borough's two police officers, Plaintiff Richard G. Behne Jr. ("Officer Behne") and Plaintiff Barry Keller ("Officer Keller")

---

[1] The facts provided herein are undisputed. If they are disputed, the court has reviewed the record to determine if the dispute is genuine. If the dispute is, in fact, genuine, the court will note the dispute, but will view it in the light most favorable to Plaintiffs as the nonmoving party. If the dispute is not genuine based on the evidence of record, the court will view the matter as undisputed.

(collectively "Plaintiffs").  Officer Behne had been employed as a police officer by the borough since 1998 (Behne Dep., Oct. 22, 2012, at p. 17), and Officer Keller had been employed as a corporal by the borough since September 2011 (Keller Dep. at p. 23).  Defendants Tami Halstead ("Defendant Halstead"), Lorrie Nulton ("Defendant Nulton"), James Ehrhart ("Defendant Ehrhart"), and James Prescott ("Defendant Prescott") (collectively "Defendant Council Members") were four of the seven council members at the time of the vote to disband the police force.  (Doc. 35-4, p. 215 of 259.)  Defendants Halstead, Nulton, and Ehrhart voted in favor of the disbandment, and Defendant Prescott abstained from voting.  Thomas Fitzpatrick ("Defendant Fitzpatrick"), although no longer an active council member at the time of the vote, remained an integral part of the council's activities, particularly with regard to the disbandment of the police force.

In the years preceding the vote, numerous events transpired that evidenced the mounting tension between the police department and certain members of the borough council, several of which are particularly noteworthy.  First, the issues between the two groups appeared to intensify in 2010 when Officer Behne joined Teamsters Local Union No. 776 and sought the union's representation in negotiating a new contract with the borough.  (*See* Fitzpatrick Dep. at pp. 27-29.) During the contract negotiations, a union representative appeared on behalf of Officer Behne at a borough council police committee meeting.  (*Id*. at p. 29.) Defendant Fitzpatrick, a council member at the time of the negotiations, later testified in his deposition that he was "annoyed" Officer Behne had joined the union for the purpose of these negotiations because his union membership would "cost [the Borough] a lot of money."  (*Id*. pp. 29-30.)  For this reason, following the union

representative's appearance at the committee meeting, Defendant Fitzpatrick and several other council members approached the borough solicitor, Stanley J. Laskowski ("Solicitor Laskowski"), concerning the borough's options regarding Officer Behne's union membership. (*Id*. at pp. 30-31, 68.) At that time, Solicitor Laskowski informed them that "he was not well versed in litigation with the union" and recommended that the council retain attorney Michael Miller, Esquire ("Attorney Miller") from the law firm of Eckert Seamans in Atlanta, Georgia, to represent the council in matters related to the police department. (*Id*. at pp. 30-31, 68.) Defendant Fitzpatrick contacted Attorney Miller to confirm his availability and retained his representation. (*Id*. at p. 31.) Subsequently, the Borough of Newport and the union entered into an employment contract on behalf of Officers Behne and Keller for the period of January 1, 2011 through December 31, 2013.

Second, following a series of escalating incidents between Officer Behne and the borough council, the council suspended Officer Behne for two minor infractions of borough policy. Prior to the suspension, Defendant Nulton had indicated that she was concerned with Officer Behne's whereabouts and suggested that the council install GPS systems in the borough police vehicles. (Fitzpatrick Dep. at p. 21.) The council voted in favor of installing the GPS systems, and Defendant Ehrhart, the borough council president at the time, selected Defendant Fitzpatrick to monitor the systems from his home computer. (Fitzpatrick Dep. at pp. 33-34.) Thereafter, Defendant Fitzpatrick provided the username and password for the monitoring system to Defendants Nulton and Halstead at their request. (*Id*. at p. 35.) The reports generated from the monitoring system, ranging anywhere from ten to 300 pages, enabled the council members to track the police vehicles' usage,

locations, and speed.  (*Id*. at pp. 42-46.)  One report generated by the system indicated that Officer Behne's vehicle had traveled at 114 miles per hour on a four-lane highway outside of the borough.  (*Id*. at p. 49.)  Officer Behne, however, denied the accuracy of the report.  Additionally, the council learned that Officer Behne had allegedly failed to report a motor vehicle accident wherein one of the vehicles required towing, thus violating a provision of the Vehicle Code that required an officer to complete an accident report when a vehicle could not be driven from the scene.  (*Id*. at p. 65.)  Officer Behne argued that he was not aware of the vehicle's need to be towed given the minor nature of the accident.  Nevertheless, based upon these two incidents, the council suspended Officer Behne for fifteen days.  As a result of his suspension and pursuant to his employment contract, Officer Behne filed a grievance with the Borough of Newport pursuant to his employment contract.  In response, the mayor of Newport, Mary Hetrick, concluded that the suspension was unwarranted and, consequently, reversed the suspension.  (Doc. 68-4, p. 25 of 27.)  Thereafter, the council, acting in accordance with the advice of Attorney Miller, voted to override the mayor's decision to rescind the suspension and effectively suspended Officer Behne.  (Fitzpatrick Dep. at pp. 62-63.)  Due to his suspension, Officer Behne filed for and was awarded unemployment compensation over Defendants' objections.[2]  (*Id*. at pp. 63-66.)  Defendant Fitzpatrick testified that this decision in Officer Behne's favor "[riled the] feathers" of some of the council members.  (*Id*. at pp. 66-67.)

---

[2] Regarding his suspension, Officer Behne also filed an unfair labor practices claim against the borough, which the parties eventually settled.  (Doc. 14, ¶ 19.)

The next event that transpired was particularly strange.  In February 2011, Defendant Halstead reported to Sergeant Charles Ringer of the Pennsylvania State Police that someone had intentionally defecated on the floor of the Borough Municipal Building.  (Ringer Dep. at pp. 30-32.)  According to Sergeant Ringer, Defendant Halstead insisted that the state police arrest and prosecute the individual responsible for the act and asserted her belief that Officer Behne was the culprit.[3] (*Id*. at pp. 33-34.)  Because of Defendant Halstead's accusation, Officer Behne agreed to undergo a polygraph test which, once completed, excluded Officer Behne as a suspect in the incident.  (Ringer Dep. p. 52.)  Sergeant Ringer notified Solicitor Laskowski that Officer Behne had passed the test and inquired whether he should polygraph anyone else.  (*Id*.)  After conferring with the borough council, Solicitor Laskowski advised Sergeant Ringer to discontinue the investigation.  (*Id*. at pp. 52-53.)

On June 8, 2011, a resident of the borough, Tana Blair, accidently collided with a parked truck while driving in front of her home and called the police to report the incident.  (Doc. 68-2, p. 45 of 48.)  Officer Behne responded to the call and assisted Ms. Blair in contacting the vehicle's owner.  (*Id*.)  Later that evening, Ms. Blair spotted two individuals looking at the truck and, assuming they owned the vehicle, told them she was responsible for the damage.  (*Id*.)  One of the individuals introduced herself as "Tammy," *i.e*., Defendant Halstead, and explained that they did not own the vehicle but wished to view the police report.  (*Id*.)  Ms. Blair relayed to Defendant Halstead that Officer Behne had explained the accident was non-

---

[3] Sergeant Ringer also testified that Defendant Halstead stated, "All police officers are corrupt."  (Ringer Dep. at pp. 32-33.)

reportable, to which Defendant Halstead responded that Officer Behne does not do his job properly and had recently been suspended. (*Id.*) Additionally, Defendant Halstead made a slew of accusations against Officer Behne, including that he frequently drives his police car at speeds in excess of 100 miles per hour without cause; that he uses illicit drugs; that he was having sexual relations with a sixteen-year-old girl; and that he frequents an establishment called "T.J.'s" where he has been seen walking around naked and having sex. (*Id.* at pp. 45-46 of 48.) Upon learning of these allegations, Officer Behne filed a lawsuit against Defendant Halstead on August 12, 2011, in the Court of Common Pleas of Perry County, Pennsylvania, alleging slander and intentional infliction of emotional distress.

Nevertheless, certain members of the borough council continued to make disparaging remarks about Officer Behne. For instance, in August 2011, the borough council began conducting interviews for the newly created position of corporal within the police department. One of the candidates, Tricia Moench, testified during her deposition that Defendant Fitzpatrick requested that she meet with him to discuss the position prior to her interview. (Moench Dep. at pp. 26, 32.) During the meeting, Defendant Fitzpatrick accused Officer Behne of being a "town bully," "womanizer," and disciplinary problem (*Id.* at pp. 34-37, 50) and explained that the council could not fire him because he was part of the union (*Id.* at p. 40). Defendant Fitzpatrick asked Ms. Moench if she "[had] a problem with not being part of a union," to which she responded "no." (*Id.*) Ms. Moench ultimately declined the position. (*Id.* at pp. 48-49.) Similarly, Officer Keller testified that, during his interviews for the corporal position, Defendants Halstead and Fitzpatrick stated that Officer Behne was taking kickbacks, using narcotics, fornicating with minor

children, and stealing evidence and equipment and that they "wanted [Officer Behne]

fired." (*Id.* at pp. 27-31.)  Defendants advised Officer Keller that, if he was offered

the position, he would be responsible for monitoring and regulating Officer Behne's

behavior and would hopefully uncover information leading to Officer Behne's

termination. (*Id.* at pp. 28, 31, 61-66.)  Officer Keller accepted the position. (*Id.* at

p. 35.)

> Upon completing his probationary status with the police department in

early 2012, Officer Keller advised Defendants Halstead and Fitzpatrick that he could

not uncover any evidence supporting their allegations against Officer Behne. (Keller

Dep. at pp. 59-60, 66-67, 96-97, 125-28.)  In addition, he told them that he intended

to remove the GPS systems from the police vehicles because the systems

compromised officer safety insofar as too many people were able to track the

officers' whereabouts at any given time. (*Id.* at pp. 110-21.)  In response,

Defendants Halstead and Fitzpatrick indicated that he would be fired if he did not

assist them in terminating Officer Behne or if he removed the GPS systems from the

police cars. (*Id.* at pp. 94, 121.)  Defendants Halstead and Fitzpatrick deny these

allegations.

> At a September 4, 2012 public council meeting, a borough resident

inquired as to why the council was investigating the borough's police officers. (Doc.

25-2, p. 2.)  In response, Defendant Prescott denied the existence of an investigation

regarding the officers but acknowledged hearing a rumor that the council intended to

disband the police force. (*Id.*)  Defendant Prescott assured the attendees that the

council would not disband the police force, stating that the council has "never

discussed disbanding the police . . . in private or in public" and any rumor stating otherwise was "false, absolutely false." (*Id*.)

Contrary to Defendant Prescott's public assurances, however, billing records from August 2012 show that attorneys from the law firm of Eckert Seamans, including Attorney Miller, were performing legal research for the borough regarding the "elimination of [a] police department." (Doc. 68-2, p. 13 of 48.) Moreover, throughout September and early October 2012, the individual defendants, without notifying council member Barbara Hart or Doug Beatty, held meetings with Attorney Miller to discuss disbanding the police department. (*See, e.g.*, Ehrhart Dep. at pp. 39-41; Prescott Dep. at pp. 15-17, 19-21; Hart Dep. at p. 32; Doc. 68-2, p. 13 of 48.) Plaintiffs insinuate that, at these meetings, the plan to disband the police force and eliminate Plaintiffs' positions was formulated.

Indeed, the evidence of record indicates that the individual defendants agreed to vote on the disbandment of the police force at a special council meeting. In advance of the special council meeting, the individual defendants, through their attorneys, prearranged a process server to "serv[e] two letters on two Borough employees," who they anticipated would be in attendance at the meeting (Doc. 68-4, p. 21 of 27; Laskowski Dep. at p. 69), and to have a locksmith change several locks on a municipal building during the meeting (Doc. 68-4, p. 23 of 27; Laskowski Dep. at p. 69). In addition, they prepared a written resolution, effective October 16, 2012, to disband the police force. (Laskowski Dep. at p. 65.) On the eve of the meeting, the borough council placed a notice in the Patriot News stating: "[T]he Newport Borough Council will hold a special meeting on Tuesday, October 16, 2012 at 8 a.m. . . . for the purpose of considering and acting upon budget and personnel matters that

come before Council." (Doc. 29-1, p. 213 of 259.)  The individual defendants elected not to inform the remaining council members of the meeting's agenda. (Ehrhart Dep. at p. 39.)

The borough council convened for the special meeting at 8 a.m. on Tuesday, October 16, 2012.  (Doc. 25-1, p. 1 of 8.)  Defendant Ehrhart called the meeting to order with council members Barbara Hart, John McNaughton, Defendant Halstead, Defendant Prescott, and Defendant Nulton present.  (*Id*.)  Attorney Miller, Solicitor Laskowski, Mayor Hetrick, and Officers Behne and Keller were also in attendance.  (*Id*.)  According to the minutes prepared by Council Secretary/Treasurer Patricia Bowers, at the beginning of the meeting, the council voted unanimously to take out a tax anticipation loan in the amount of $75,000 "just in case [the borough] would need it to begin the year or to finish this year out."  (*Id*.)  After addressing scheduling and overtime issues pertaining to the police department, the council commenced a discussion regarding the 2013 General Fund Budget and potential options to remedy a financial shortfall.  (*Id*. pp. 2-3.)  The council initially considered raising the tax millage rate by approximately 3.25 mills, which would have increased taxes by approximately $172,540,[4] nearly doubling the 2012 millage rate.  (*Id*. at p. 2; Prescott Dep. at p. 8.)  Concerned about the burden a tax increase would place on borough residents, the council considered other options, including

---

[4] Although the court twice struck Plaintiff's motion for summary judgment for failure to comply with local rules (Docs. 67 & 75), and therefore all subsequent filings pursuant to that motion were also stricken, the court is aware of Defendants' correction, provided in footnote 2 of their motion in opposition (Doc. 74, p. 9 of 30).  In footnote 2, Defendants correct their prior inadvertent, yet consistent, misrepresentations to the court wherein they stated that the borough would have had to raise taxes approximately $3,250,000 to cover their budget shortfall (*see, e.g.*, Doc. 36, p. 8).  In correcting their prior statements, Defendants state that an increase in the millage rate between 3.25 and 4 mills was considered, which would have increased taxes approximately $172,540.  (Doc. 74, p. 9 of 10.)

cancelling flood insurance and cutting council members' salaries.  (Doc. 25-1, pp. 2-3, 6 of 8.)  As an alternative, Defendant Halstead suggested they eliminate the police force.

Defendant Halstead advised the council that the Pennsylvania State Police provides police coverage to the borough at no cost while the borough's police department cost approximately $188,000 per year.  (*Id*. at p. 3 of 8.)  In light of council's budget being $159,000 short, she suggested the borough use state police coverage exclusively and eliminate the borough police force. (*Id*.)  At that point, Defendant Halstead moved, seconded by Defendant Nulton, "to adopt a resolution to disband the Newport Borough Police Department to completely and permanently cease providing local police service immediately." (*Id*.)  Defendant Ehrhart then called for public comment on the matter.  Officer Keller and council members McNaughton and Hart voiced adamant opposition to Defendant Halstead's motion. (*Id*. at pp. 4, 6 of 8.)  Two members of the public also commented, with one in favor and one opposed. (*Id*. at pp. 4-6 of 8.)  Following the public comment period, Defendant Halstead again motioned to consider a "resolution" to disband the police department effective immediately.  The motion was carried by a vote of three-to-two, with Defendants Halstead, Nulton, and Ehrhart voting "yes," and council members Hart and McNaughton voting "no." (*Id*. at p. 7.)  Defendant Prescott abstained from voting based on the advice of Jason Kraft, Local Union 776 Business Agent. (*Id*.) Following the vote, council member McNaughton resigned from the council due to his disapproval of the council's actions in the matter, and Defendants Nulton and Halstead moved to accept his resignation. (*Id*.)  The meeting was thereafter adjourned. (*Id*. at p. 8.)  Plaintiffs allege that, after the meeting, they were

immediately forced to surrender their badges and borough equipment and were locked out of the police department.  (Doc. 14, ¶ 76.)

Following the abrupt termination of their positions, Officers Behne and Keller commenced suit against the Borough, Defendant Council Members, and Defendant Fitzpatrick on January 8, 2013 (Doc. 1), alleging, *inter alia*, that the individual defendants orchestrated a scheme to terminate Plaintiffs' employment due to personal vendettas and anti-union animus.  They contend that Defendants acted under color of state law and that their actions were intentional and undertaken with reckless disregard of Plaintiffs' federally protected property rights in their continued employment.

### B.     Procedural Background

Plaintiffs' complaint, filed on January 8, 2013 (Doc. 1) and amended on April 5, 2013 (Doc. 14), asserts various federal and state law claims.  First, Plaintiffs bring claims under the civil rights statute, 42 U.S.C. § 1983, alleging that Defendants deprived them of their procedural due process rights in the course of the proceedings leading to the disbandment of the police department and the termination of their employment.  (Doc. 1, Counts I & II.)  Second, Plaintiffs assert that Defendants conspired to violate Plaintiffs' rights, in violation of 42 U.S.C. § 1985(2) and (3).  (*Id*. at Counts III & IV.)  Third, Plaintiffs bring additional Section 1983 claims against Defendants alleging that the disbandment represented a form of constitutionally prohibited retaliation against their engaging in certain activities protected by the First Amendment.  (*Id*. at Counts V & VI.)  Fourth, Plaintiffs bring a claim pursuant to 42 U.S.C. § 1986 against the individual defendants for failing to prevent the commission of a wrongful act.  (*Id*. at Counts XVIII-XIX.)  Finally,

Plaintiffs lodge several pendent state claims for damages.  (*Id*. at Counts VII-XVII, XX.)

In response to the amended complaint, Defendants filed a motion to dismiss for failure to state a claim (Doc. 10), which the court subsequently converted into a motion for summary judgment  (Doc. 27).  On August 12, 2013, Defendants perfected their motion for summary judgment by filing a statement of material facts (Doc. 35) and supplemental brief in support thereof, as permitted by the court (Doc. 36).  Defendants' motion raises, among other issues, the defenses of absolute legislative and qualified immunity, and states that Plaintiffs' evidence fails to demonstrate a disputed issue of material fact.  In the motion, Defendants describe their action as a measured and appropriate response to the borough's increasing budgetary concerns.

Plaintiffs filed a response to Defendants' statement of material facts on September 9, 2013 (Doc. 52), but failed to cite to the parts of the record supporting their statements, as required by Local Rule 56.1.  Additionally, Plaintiffs failed to file a supplemental brief.  On October 22, 2013, the court issued an order directing Plaintiffs to file a counter-statement of material facts with appropriate citations to the record by October 30, 2013 (Doc. 67), thus providing Plaintiffs an opportunity to defend the dispositive motion.  In accordance with the order, Plaintiffs filed a revised response to Defendants' statement of material facts on October 29, 2013.  (Doc. 68.) Plaintiffs, however, elected not to file a supplemental brief.  Therefore, the motion for summary judgment is ripe for disposition.

For the reasons set forth below, the court finds that Defendants are entitled to summary judgment on several asserted claims.  However, as to Plaintiffs'

core assertions that the disbandment of the police department violated their due process rights and constituted an illegal form of retaliation, the court concludes that disputed factual issues preclude summary judgment.

## II.        **Standard of Review**

Summary judgment is proper when the record, taken in its entirety, shows that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable factfinder to return a verdict for the non-moving party. *Id.*  When evaluating a motion for summary judgment, a court "must view the facts in the light most favorable to the non-moving party," and draw all reasonable inferences in favor of the same. *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004) (citation omitted)

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  "Once the moving party points to evidence demonstrating [that] no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." *Azur v. Chase Bank, USA*, 601 F.3d 212, 216 (3d Cir. 2010).  The non-moving party may not simply sit back and rest on the allegations in its complaint; instead, the party must "go beyond the pleadings and by [its] own

affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Syed*, 906 F. Supp. 2d at 354 (alteration in original) (citing *Celotex*, 477 U.S. at 324). Summary judgment should be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *accord Ullrich v. United States Sec'y of Veterans Affairs*, 457 F. App'x 132 (3d Cir. 2012). If the non-moving party's evidence "is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992) (alteration in original) (quoting *Anderson*, 477 U.S. at 249-50). However, "[s]uch affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of W. Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

A court may not consider the credibility or weight of the evidence in deciding a motion for summary judgment, even if the quantity of the moving party's evidence far outweighs that of its opponent. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). Rather, it remains the "province of the factfinder to ascertain the believability and weight of the evidence." *Id.* For purposes of considering a motion for summary judgment, the court "should not consider the record solely in piecemeal fashion, giving credence to innocent explanations for individual strands of evidence, [because] a jury . . . would be entitled to view the evidence as a whole." *Abramson v. William Patterson Coll. of*

14

*N.J.*, 260 F.3d 265, 285 (3d Cir. 2001) (citing *Howley v. Town of Stratford*, 217 F.3d 141, 151 (2d Cir. 2000)).

**III.**        <u>Discussion</u>

       Plaintiffs allege, *inter alia*, that Defendants' actions in disbanding the police force violated Plaintiffs' constitutional rights.  Specifically, Plaintiffs allege that certain individual defendants harbored personal animosity toward them and that others disfavored their union membership resulting in Defendants' strategic and concerted effort to circumvent established state and federal laws in order to terminate Plaintiffs' employment.  Defendants contend that the council's decision to abolish the police force was based purely on bona fide budgetary constraints.  Defendants further argue that, regardless of the council's motivation, Defendants are immune from suit and that Plaintiffs have failed to demonstrate a genuine issue of material fact.  The court will address each of Defendants' arguments in an order that facilitates discussion.

       **A.**      <u>Absolute Immunity</u>

       The court will first consider whether Defendants are entitled to absolute immunity before addressing the merits of Plaintiffs' claims.

       **1.**      <u>Legislative Immunity</u>

       Defendant Council Members first contend that they are absolutely immune from suit, arguing that the council's vote to disband the police force was a legislative act to which absolute immunity attaches.  In turn, Plaintiffs argue that it was not a legislative act because the disbandment was effectuated by resolution

rather than by ordinance and, therefore, Defendant Council Members are not entitled to immunity.

It is well established that local legislators, like federal and state legislators, are absolutely immune from suit based on their legislative activities. *In re Montgomery Cnty.*, 215 F.3d 367, 376 (3d Cir. 2000) (citing *Bogan v. Scott-Harris*, 523 U.S. 44, 54-55 (1998)). To be considered legislative, however, the act must be "both substantively and procedurally legislative in nature." *Id.* (citing *Carver v. Foerster*, 102 F.3d 96, 100 (3d Cir. 1996)). "This test is designed to protect acts that are 'within the sphere of legitimate, legislative activity.'" *Kalinoski v. Lackawanna Cnty.*, 511 F. App'x 208, 212 (3d Cir. 2013). In applying the test, the court must look only at the acts themselves "stripped of all considerations of intent and motive." *Baraka v. McGreevey*, 481 F.3d 187, 198 (3d Cir. 2007).

An act is "substantively" legislative, *i.e.*, legislative in character, when it involves policy-making of a general scope or linedrawing. *Gallas v. Supreme Ct. of Pa.*, 211 F.3d 760, 774 (3d Cir. 2000). Conversely, where the act "affects a small number or a single individual, the legislative power is not implicated, and the act takes on the nature of administration." *Id*. In the context of public employment, the Third Circuit has drawn a distinction between the elimination of a position and the termination of an individual employee, characterizing the former as legislative and the latter as administrative in nature. *Kalinoski*, 511 F. App'x at 212 (citing *Baraka*, 481 F.3d at 199-200) (citing cases)). In *Baraka*, the Third Circuit noted this distinction and reasoned that the elimination of a position was the type of policy-making that "traditional legislation entails" and further noted that the defendant's motivation in enacting the law to eliminate the plaintiff's position, whether

16

concerned specifically with the plaintiff or with genuine public concerns, was immaterial.  *Baraka*, 481 F.3d at 199-200.  Therefore, in the present case, it is clear under Third Circuit precedent that the abolishment of the police force and corresponding elimination of Plaintiffs' positions were substantively legislative in nature.  *See id.; see also Bogan*, 523 U.S. at 55-56.

The remaining question is whether the act was also procedurally legislative in nature, thus entitling Defendant Council Members to legislative immunity.  An act is procedurally legislative "if it is undertaken 'by means of established legislative procedures.'"  *In re Montgomery Cnty*., 215 F.3d at 376 (quoting *Carver,* 102 F.3d at 100)).  "This principle requires that constitutionally accepted procedures of enacting the legislation must be followed in order to assure that the act is a legitimate, reasoned decision representing the will of the people which the governing body has been chosen to serve."  *Gallas*, 211 F.3d at 774.

Thus, the gravamen of the instant action is the procedure by which the police force was disbanded.  Defendants argue that the abolition of the police force by vote, rather than through the enactment of an ordinance, was a procedurally legislative act, thereby allowing absolute legislative immunity to attach.  The court, however, has little trouble finding that Defendant Council Members' actions were not procedurally legislative, as this court has previously held that failure to pass an ordinance effectuating the disbandment of a police force precludes characterizing the action as legislative – a decision that was affirmed by the Third Circuit.  *Donivan v. Dallastown Borough*, Civ. No. 86-0277 (M.D. Pa. May 22, 1987), *aff'd* 835 F.2d 486 (3d Cir. 1987).

The Borough of Newport operates under the Pennsylvania Borough Code,[5] which describes a borough's legislative powers as follows:

> Every legislative act of council shall be by ordinance and these legislative acts shall include, but not be limited to, tax ordinances, general appropriation ordinances, capital expenditures not payable out of current funds, and all legislation exercising the police power of the borough, regulating land use, development and subdivision, imposing building, plumbing, electrical, property maintenance, housing and similar standards, and otherwise regulating the conduct of persons or entities within the borough and imposing penalties on the provisions thereof.

53 P.S. § 48301.1(b).  The ordinance procedure requires publication of the proposed ordinance in a "newspaper of general circulation no more than [sixty] days *nor fewer than seven days prior to enactment . . . ." Id*. at § 48301.2(a) (emphasis supplied). The publication must include "either the full text [of the proposed ordinance ] or the title, . . . a brief summary prepared by the borough solicitor setting forth all the provisions in reasonable detail[,] and a reference to a place within the borough where copies of the proposed ordinance may be examined."  *Id*.  In addition, every ordinance enacted by the council must be presented to the mayor for approval.  *Id*. at § 48301.3(a)(1).  If the mayor vetoes the ordinance, a majority of all elected council members plus one must vote in favor of the ordinance to override the mayor's veto. *Id*. at § 48301.3(a)(2).

---

[5] The "new" Pennsylvania Borough Code became effective on July 16, 2012, and was therefore the law at the time the council voted to abolish the police department.  The court notes, however, that both parties site to the "old" Code in their briefs.  In any event, while certain language and citations were changed by the comprehensive Code revision, the essential procedural requirements pertaining to ordinances have remained the same since 1966.

Accordingly, in *Donivan*, the Third Circuit held that, pursuant to the Borough Code, the legislative powers of a borough "*require* enactment of an ordinance; if an act is accomplished by means other than an ordinance, it is not an exercise of legislative activity." 835 F.2d at 489 (3d Cir. 1987) (emphasis added). The Third Circuit explained that "because municipal corporations have been delegated legislative authority only within strictly defined statutory limits, they can only act legislatively when following the statutory procedures specified for such action." *Id.* at 488 (quoting *Abraham v. Perkarski*, 728 F.2d 167, 174 (3d Cir. 1984)). Here, however, Defendant Council Members abolished the police force by resolution rather than by ordinance, and, thus, under *Donivan*, it was not a legislative act and was beyond the scope of legislative immunity.

Defendant Council Members argue that, although they did not enact an ordinance, they disbanded the police force via a "formal [r]esolution," following notice, debate, public comment, and a vote and suggest that such a procedure should be considered legislative for purposes of immunity since it mirrors the procedure required for passing an ordinance. (Doc. 36, p. 22 of 27.) However, the procedural disparity between council's actions and those required for a legislative act is not simply limited to a difference in title; rather, the discrepancies are both numerous and significant and call into question whether the act was a legitimate and reasoned decision representing the will of the people. *See Kalinoski*, 511 F. App'x at 213.

For example, in stark contrast to the requirement that either the full text or the title and a brief summary of the proposed ordinance be published in a newspaper of general circulation at least seven days prior to the vote, the borough

council placed the following advertisement in The Patriot News just one day prior to the meeting:

> NOTICE is hereby given that the Newport Borough
> Council will hold a Special Meeting on Tuesday, October
> 16, 2012 at 8 a.m. in the Borough Municipal Building . . .
> for the purpose of considering and acting upon budget and
> personnel matters that come before Council.

Doc. 35-4, p. 213 of 259.  Not only did the council provide insufficient temporal notice of the meeting, they also provided no notice that the disbandment of the police force would be considered, as required by the Borough Code.  Moreover, rather than holding the meeting at the standard starting time of 7 p.m., they scheduled it for  8 *a.m.*, thus, as can be inferred, drastically reducing the number of public participants. The last major procedural defect involved council's failure to present the resolution to the mayor for approval.[6]  (*Id*. at p. 12 of 17.)

In addition, Plaintiffs posit that the meeting lacked any meaningful debate or discussion because the individual defendants actually made the decision to disband the police force prior to the meeting, and the undisputed facts of record strongly corroborate Plaintiffs' position.  Indeed, the record shows, *inter alia*: that the individual defendants held secret meetings with Attorney Miller pertaining to the potential disbandment; that the council members who supported the police officers were not made aware of the meeting's agenda; that the resolution was prepared in

---

[6] A fair reading of Plaintiffs' complaints and arguments in this case suggests that the reason the individual defendants chose to pass a resolution rather than to enact an ordinance was to avoid the stringent procedural requirements required for passing an ordinance.  More specifically, Plaintiffs' claims suggest that: the individual defendants would have encountered public opposition to the ordinance had they properly advertised the proposed disbandment in a newspaper and held the meeting in the evening rather than on a weekday at 8 a.m.; the mayor would have rejected the ordinance; and, subsequent to a veto, the individual defendants would not have had the necessary votes for a majority plus one to override the mayor's veto.

advance of the meeting; that a locksmith changed the locks at the police department during the meeting; and that a process server attended the meeting to obtain Plaintiffs' police identification. (*See* Doc. 68, ¶ 19.)

> In conclusion, as the Third Circuit explained:

> The ordinance procedure exists for a purpose. The publication requirement gives notice to the community of impending legislative activity and, where, as here, the community will certainly be affected by the council's actions, the rationale for publication is an important consideration. The council members themselves have encouraged us to consider that their abolishment of the police force impacted the community in a permanent nature. This is one of the best reasons for requiring passage by an ordinance and for the withholding of legislative immunity if the proper procedures are not followed.

*Donivan*, 835 F.2d at 489. Thus, as in *Donivan*, Defendant Council Members' failure to pass an ordinance to effectuate the disbandment of the police force precludes characterizing their actions as legislative. As the Third Circuit emphasized, the procedural requirements of the Borough Code are not merely empty form, but serve to provide notice to the community of legislative activity and create a system of "checks and balances" for the council. *Id*. at 489. Because Defendant Council Members' actions in passing a resolution did not conform to the ordinance procedure set forth in the Borough Code and required by the Third Circuit, they are not entitled to legislative immunity and the court will deny Defendants' motion for summary judgment on that basis.[7]

---

[7]  Defendants also contend that they are entitled to legislative immunity because they relied on advice of counsel in disbanding the police force via resolution rather than enactment of an

(continued...)

## 2.   __Borough Immunity__

The Borough of Newport also moves for summary judgment in part on the ground of absolute immunity.  As a municipal entity, the Borough of Newport cannot be held liable for the unconstitutional acts of its employees on a theory of respondeat superior.  *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978).  However, the Borough of Newport may be held liable for the alleged constitutional infractions perpetrated upon Plaintiffs if "there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).  In other words, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under Section 1983."  *Monell*, 436 U.S. at 694.  "A policy is a decision of a municipality's 'duly constituted legislative body' or of 'officials whose acts may fairly be said to be those of the municipality.'  A custom is a practice that, although 'not . . . formally approved by an appropriate decisionmaker . . . is so widespread as to have the force of law.'"  *Kocher v. Larksville Borough*, Civ. No. 13-1573, 2013 WL 6439651, *6, — F. App'x — (3d Cir. 2013) (quoting *Board of the Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403-04 (1997)).

In this case, the act which allegedly infringed upon Plaintiffs' constitutional rights is the resolution adopted by a local governmental body, *i.e.*, the Newport Borough Council.  As indicated, local governing bodies can be sued under

---

[7](...continued)
ordinance.  Because this argument is better suited for qualified immunity, the court will address it in that portion of the memorandum.

Section 1983 where the action that is alleged to be unconstitutional "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690.  Viewing the facts in the light most favorable to Plaintiffs and as addressed more fully below, it appears that the individual defendants orchestrated a plan to circumvent the law and disband the police force by resolution rather than ordinance in order terminate Plaintiffs from their employment without providing them due process of law and in retaliation for Plaintiffs' exercising their First Amendment rights.  Because the court concludes that the resolution in question can be fairly characterized as "a decision officially adopted and promulgated" by the borough council, the court concludes that the Borough of Newport is not entitled to absolute immunity.

### B.   Constitutional Claims

Having determined that Defendants are not entitled to absolute immunity, the court will address the merits of Plaintiffs' various constitutional claims.  In their amended complaint, Plaintiffs assert that Defendant Council Members, Defendant Fitzpatrick, and the Borough of Newport violated their rights under 42 U.S.C. §§ 1983, 1985, and 1986.  The court will address each claim in turn.

### 1.   Procedural Due Process

Plaintiffs allege that, under Pennsylvania, law they had a right to their employment as police officers that constituted a property interest within the meaning of the due process clause of the Fourteenth Amendment, and that the manner in which Defendants disbanded the police force deprived them of this property right

23

without procedural due process.[8]  Defendants essentially contend that, while Plaintiffs may have been protected from removal without just cause, the council's decision to abolish the entire police force for economic reasons did not trigger Plaintiffs' due process rights.

The court's analysis of Plaintiffs' procedural due process claim[8] begins with the familiar proposition that 42 U.S.C. § 1983 "is not itself a source of substantive rights, but [rather] a method for vindicating federal rights elsewhere conferred." *Elmore v. Cleary*, 399 F.3d 279, 281 (3d Cir. 2005). Therefore, liability under 42 U.S.C. § 1983 exists only when a plaintiff shows that the defendant, acting under color of state law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury.  *Id.*

In a public employment context, the contours of the Fourteenth Amendment's due process protections are clearly defined.  *Bartos v. Pennsylvania Dept. of Envtl. Prot.*, No. 1:08-cv-0366, 2011 WL 2456613, *12 (M.D. Pa. May 25, 2011).  The Fourteenth Amendment prohibits deprivations "of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1.  The first step in analyzing a procedural due process claim is to determine:  "(1) whether the plaintiff has a property interest protected by procedural due process, and (2) what procedures constitute 'due process of law.'"  *Schmidt v. Creedon*, 639 F.3d 587, 595 (3d Cir. 2011) (quoting *Gikas v. Washington Sch. Dist.*, 328 F.3d 731, 737  (3d Cir. 2003))

---

[8]  Unfortunately, Plaintiffs' arguments regarding their procedural due process claim leaves much to be desired.  (*See* Doc. 25, pp. 13-14.)  The court expects, at the minimum, coherent articulation of the parties' positions.  While Plaintiffs' failed to provide as much in their brief, the court will infer their arguments in this regard from a fair reading of the complaint.

[8]  Officer Behne's and Officer Keller's due process claims (Counts I and II) will be addressed together as they rely on the same factual basis.

24

(internal quotations omitted).  The Supreme Court has consistently held that "the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" *Phillips v. Washington Legal Found.*, 524 U.S. 156, 164 (1998) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)).  "To have a property interest in a job . . . a person must have more than a unilateral expectation of continued employment;  rather, [he] must have a legitimate entitlement to such continued employment."  *Elmore,* 399 F.3d at 282.  If state law creates a property interest for purposes of the Fourteenth Amendment, a person cannot be deprived of that interest other than in accordance with federal standards of due process.  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985).  Generally, a deprivation of property "must be preceded by notice and opportunity for [a] hearing appropriate to the nature of the case."  *Biliski v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 574 F.3d 214, 220 (3d Cir. 2009).  In the employment context, notice and an opportunity to be heard typically refer to having "some kind of a hearing" before being discharged.  *Loudermill*, 470 U.S. at 542.

In the matter *sub judice*, Defendants do not dispute that Plaintiffs had a constitutionally protected property interest in their jobs as Pennsylvania police officers.  *Dee v. Borough of Dunmore*, 549 F.3d 225, 230 (3d Cir. 2008); *Dombrosky v. Banach*, No. 3:09-cv-2579, 2012 WL 1899656, *10 (M.D. Pa. May 24, 2012); *Maule v. Susquehanna Reg'l Police Comm'n*, Civ. No. 04-cv-05933, 2007 WL 2844587, *6 (E.D. Pa. Sept. 27, 2007); 53 P.S. § 46190.  Rather, Defendants argue that, under Pennsylvania's reorganization exception, Plaintiffs did not retain a

property interest in their employment because their positions were eliminated due to the borough's diminishing financial resources and, therefore, the procedural due process guarantees of the Fourteenth Amendment were inapplicable.  The court disagrees.

Pennsylvania courts do, indeed, recognize a limited "reorganization exception" whereby a public employee's substantive property right to his employment is lost where a government abolishes a department or position or reduces its workforce for economic reasons.  *Dombrosky*, 2012 WL 1899656 at *10; *Baker v. Port Royal*, Civ. No. 1:CV-06-0932, 2007 WL 1576439 at *6 (M.D. Pa. May 30, 2007).  This exception removes the need for a hearing whenever terminations are directed at positions rather than individuals.  As the Pennsylvania Supreme Court has explained:  "In such cases, since there are no charges against the employee . . . involved, there would be no occasion for a hearing, and it would be idle to hold one." *Kusza v. Maximonis*, 70 A.2d 329, 331 (Pa. 1950).  An employee may only challenge the abolition of his position by showing that the municipality's actions were "a mere pretense or subterfuge." *Township of Perkiomen v. Mest*, 522 A.2d 516, 520 (Pa. 1987).  However, in evaluating the employee's claim, "a court may not pry into the motives of [the] local legislative body." *Id*. at 519.  Instead, the employee must demonstrate either that (1) the position or department was eliminated to circumvent a court order requiring reinstatement of an employee, or (2) that the eliminated position or department was subsequently recreated. *Mest*, 522 A.2d at 520.

Implicit in the applicability of the reorganization exception, however, is the proper exercise of a legislative act. *See, e.g.*, *Mest*, 522 A.2d at 520 ("Potential

26

review of every *legislative* decision made in order to find improper personal or political motives would lead to government by the judiciary." (emphasis supplied)); *Carey v. City of Altoona*, 339 Pa. 541, 543 (Pa. 1940) (holding that "where the office itself is abolished by *legislative act or ordinance* a court will not pry into the motives of the legislators who voted for its passage" (emphasis supplied)); *Schearer v. City of Reading*, 346 Pa. 27, 30 (Pa. 1942) ("But we find that by the very *ordinance* which purported to abolish the chief of police, the position of police commissioner was created at the identical salary and precisely the same duties." (emphasis supplied)). Here, where the abolition of the department was clearly done in contravention of established legislative procedure, the court will not grant judgment predicated on the reorganization exception, which requires adherence to the legislative process. As addressed above, a municipality must enact an ordinance in order to be considered as functioning in a capacity which would confer the presumption of validity to their actions. In such a case, the municipality's actions could only be rebutted by the narrow limits of the reorganization exception. However, in this case, Defendants' actions in abolishing the police force by resolution rather than by ordinance circumvented the legislative protections of the law. Thus, just as Defendants are not entitled to the protections of legislative immunity when they acted by means other than legislative activity, they cannot receive the benefits of the reorganization exception.

Because the court finds that the reorganization exception does not apply to the facts of this case, it is for the jury to conclude whether Plaintiffs were denied due process of law when Defendants abolished the police force by resolution. There is, indeed, evidence that Defendants strategically elected to use a resolution to

effectuate the disbandment of the police force in order to bypass the more stringent requirements of the ordinance procedure, which would require, *inter alia*, proper notice and approval by the mayor.  If the jury determines that Defendants acted with improper motive and in a concerted effort to deprive Plaintiffs of their employment without due process of law and without the safeguards provided both to them individually and to the borough's citizens through the ordinance procedure, Plaintiffs may succeed on their due process claims as it is undisputed that Plaintiffs received neither notice nor opportunity to respond before being terminated.  Accordingly, Defendants are not entitled to judgment as a matter of law as to Plaintiffs' claims for violations of procedural due process.

### 2.   Conspiracy

Plaintiffs also advance claims for conspiracy against Defendants pursuant to Sections 1985(2) and (3).[9]  The court will address each claim in turn.

### a.   Section 1985(3)

Plaintiffs allege that Defendants engaged in a conspiracy to deprive them of their constitutional rights in violation of 42 U.S.C. § 1985(3).  Section 1985(3) prohibits two or more persons in any state from conspiring to deprive any person or class of persons of the equal protection of the laws.  42 U.S.C. § 1985(3).  To succeed on a claim under Section 1985(3), a plaintiff must show: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . (3) an act in furtherance of the conspiracy; [and] (4)

---

[9]  Officer Behne's and Officer Keller's conspiracy claims (Counts III and IV) will be addressed together as they rely on the same factual basis.

whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Farber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006) (quoting *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828-29 (1983)).  With regard to the second element of the claim, it has long been established that Section 1985(3) requires "some racial, *or perhaps otherwise class-based,* invidiously discriminatory animus behind the conspirators' action." *Id*. at 135 (citations omitted, emphasis in original).

Plaintiffs have shown evidence of the existence of a conspiracy between the individual defendants to deprive Plaintiffs of their right to procedural due process.  However, Plaintiffs have not alleged, and the court cannot find, any evidence of the requisite racial or class-based animus.  While a fair reading of the amended complaint advances a claim that Defendants conspired against Plaintiffs on the basis of their union membership, the Third Circuit has found that discriminatory animus directed at a class based on political affiliation, including union or non-union membership, is not "invidious" for purposes of a Section 1985(3) claim. *Farber*, 440 F.3d at 138-43 ("[U]nlike discrimination against a class on the basis of race, sex, or mental retardation, discrimination on the basis of political affiliation is not, as a matter of law, so invidious such that [Section] 1985(3) would apply.").  Likewise, in *Scott*, 463 U.S. at 838, the Supreme Court rejected the notion that Section 1985 protects against discrimination on the basis of union membership.  Because Plaintiffs have not set forth any evidence tending to establish a class-based conspiracy, Defendants motion for summary judgment regarding Plaintiffs' Section 1985(3) conspiracy claims will be granted.

### b.   Section 1985(2)

Plaintiffs also allege that Defendants conspired to deprive Plaintiffs of their employment in order to prevent Plaintiffs' investigation and testimony before a state or federal court relating to "financial irregularities" in the borough's funds. (Doc. 14, pp. 17-18.)  To advance an obstruction of justice claim under Section 1985(2), a plaintiff must show a conspiracy "for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny any citizen the equal protection of the laws."  42 U.S.C. § 1985(2).  As in a Section 1985(3) claim, a plaintiff must allege that the defendants colluded with the requisite "'racial, or . . . otherwise class-based, invidiously discriminatory animus."  *Davis v. Township of Hillside*, 190 F.3d 167, 171 (3d Cir. 1999).

Here, Plaintiffs' Section 1985 claims fail for at least two reasons.  First, as with their Section 1985(3) claims, Plaintiffs have not identified any facts which would permit an inference that Defendants were motivated by the requisite racial or class-based animus.  Second, Plaintiffs do not identify any pending state or federal court proceeding which was the subject of unlawful interference.  *See Holmes v. Benedict*, No. 1:12-cv-767, 2012 WL 6561559, *6 (M.D. Pa. Nov. 27, 2012).  Thus, Defendants' motion for summary judgment with regard to Plaintiffs' Section 1985(2) claims will be granted.[10]

---

[10]   Plaintiffs additionally assert derivative claims under 42 U.S.C. § 1986.  However, Section 1986 constitutes an additional safeguard for those rights protected under Section 1985, and, therefore, transgressions of Section 1986 depend on a preexisting violation of Section 1985.  *Clark v. Clabaugh*, 20 F.3d 1290, 1295 (3d Cir. 1994).  Having found there is no viable claim pursuant to Section 1985, there can be no viable claim under Section 1986 for failure to prevent acts prohibited in Section 1985.  *See Dreher v. Vaughn*, Civ. No. 94-4810, 1995 WL 386789, *3 (E.D. Pa. Jun. 29, 1995).

(continued...)

### 3.    First Amendment Retaliation Claims

Under the First Amendment, governmental actors are prohibited from "abridging the freedom of speech . . . or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. In this case, Plaintiffs claim they were retaliated against in violation of the First Amendment after they engaged in various forms of protected conduct, including, *inter alia*, publicly criticizing members of the borough council and associating with a labor union.[11]

The Supreme Court has made clear that public employees do not relinquish their protections under the First Amendment by reason of their employment. *See, e.g.*, *United States v. National Treasury Emps. Union*, 513 U.S. 454, 466 (1995); *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968). A three-part test is utilized to assess a public employee's First Amendment retaliation claim. *Whitfield v. Chartiers Valley Sch. Dist.*, 707 F. Supp. 2d 561, 582 (W.D. Apr. 15, 2010). First, the employee must demonstrate that he engaged in activity that is protected by the First Amendment. *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d. Cir. 2009). Second, the employee must show that the protected activity was a substantial factor in the adverse employment decision. *Green v. Philadelphia Hous. Auth.*, 105 F.3d 882, 885 (3d Cir. 1997); *Gorum*, 561 F.3d at 184. After this initial burden is met, the employer may justify the adverse action by showing that it

---

[10] (...continued)
The court will therefore summarily grant Defendants' motion for summary judgment as to Plaintiffs' Section 1986 claims.

[11]    For purposes of this motion, the court will address Plaintiffs' retaliation claims (Counts V & VI) together as they rely primarily on the same factual basis.

Case 1:13-cv-00056-SHR   Document 76   Filed 04/29/14   Page 32 of 60

would have reached the same decision even in the absence of the protected conduct. *Hill v. City of Scranton*, 411 F.3d 118, 127 (3d Cir. 2005); *Green,* 105 F.3d at 885; *Pro v. Donatucci*, 81 F.3d 1283, 1288 (3d Cir. 1996).

The Third Circuit has instructed that the first part of this test regarding whether the activity was protected by the First Amendment is a question of law for the court, whereas the second and third factors are typically factual questions for the jury. *Hill*, 411 F.3d at 127 (citing *Curinga v. City of Clairton*, 357 F.3d 305, 310 (3d Cir. 2004)). However, the Third Circuit has also instructed that the second and third factors are properly reserved for the jury only where "*genuine* questions of fact" remain unresolved. *Id*. (emphasis in original). In this case, the court finds that these factors should be committed to a jury's consideration because Plaintiffs have presented sufficient evidence to support their claims for First Amendment retaliation.

### a.  **Protected Activity**

Plaintiffs have taken a scattershot approach in an effort to identify protected conduct for which they were allegedly retaliated against.[12]  The court has

---

[12]  Specifically, Plaintiff Behne alleges that he was terminated in retaliation for:  (1) applying for unemployment compensation; (2) filing an unfair labor practices claim against the borough; (3) filing a civil lawsuit against Defendant Halstead; (4) issuing traffic citations to members of the borough council and their families; and (5) criticizing members of the borough council at public meetings.  (Doc. 14, p. 19 of 29.)  Plaintiff Keller alleges that he was terminated in retaliation for: (1) refusing to submit false information against Plaintiff Behne; (2) issuing traffic citations to members of the borough council and their families; (3) investigating members of the borough council with regard to possible financial irregularities; (4) criticizing members of the borough council at public meetings; and (5) advising the borough council at public meetings that Defendant Halstead was telling lies.  (*Id*. at pp. 20-21.)  In addition, a fair reading of the amended complaint provides that Plaintiffs also allege they were retaliated against for their union membership.  (*See*, *e.g*., *id*. at pp. 4, 12.)

considered all of the conduct and, for the sake of expediency, will address only those that have merit.[13]

### i.   <u>Right to Free Speech</u>

Both Officer Behne and Officer Keller allege that they engaged in protected speech when they criticized members of the borough council at public meetings. To be protected, an employee's speech must implicate a matter of public concern. *Miller v. Clinton Cnty.*, 544 F.3d 542, 548 (3d Cir. 2008) (citing *Connick v. Myers*, 461 U.S. 138, 146-48 (1983)). Speech can be fairly characterized as implicating a matter of public concern "if the content, form, and context establish that the speech involves a matter of political, social, or other concern to the community." *Id.* Speech may be a matter of public concern, for example, when the speaker seeks to "bring to light actual or potential wrongdoing or breach of public trust" on the part of a governmental official. *Borden v. School Dist. of Twp. of E. Brunswick*, 523 F.3d 153, 170 (3d Cir. 2008) (quoting *Connick*, 461 U.S. at 148). However, "public speech cannot 'constitute merely personal grievances.'" *Brennan*

---

[13] The court will provide the following explanation for concluding that the other activities were not protected by the First Amendment. Issuing traffic citations falls squarely within a borough police officer's professional responsibilities and therefore is not entitled to First Amendment protection. *See Kocher v. Larksville Borough*, — F. App'x —, * 4 (3d Cir. 2013). Likewise, investigating possible criminal activity, *i.e.*, "financial irregularities" within the borough's budget, was part of Officer Keller's official activities. In addition, because Officer Behne does not allege that his applying for worker's compensation sought anything other than an award of individual benefits, the filing of the claim cannot form the basis of a First Amendment retaliation claim. *Cruz-Smith v. Sinclair*, Civ. No. 10-3609, 2011 WL 3652462, *5 (E.D. Pa. Aug. 19, 2011). Moreover, applying for workers' compensation benefits is not a protected activity under the First Amendment. *See, e.g.*, *Francis v. Lotwick*, Civ. No. 1:12-cv-842, 2012 WL 4747433, *4 (M.D. Pa. Oct. 4, 2012); *Roberts v. Ferman*, No. 09-4895, 2011 WL 2937398, *14 (E.D. Pa. Jul. 20, 2011). While filing a lawsuit against an employer is protected by the First Amendment, *Anderson v. Davila*, 125 F.3d 148, 161 (3d. Cir. 1997), filing a "slander lawsuit" (Doc. 14, ¶ 37) against Defendant Halstead in her individual capacity is not entitled to such protection. However, Officer Behne's filing an unfair labor practices claim against the borough is protected speech and will be addressed in the causation section of this discussion, rather than on its own.

*v. Norton*, 350 F.3d 399, 412 (3d Cir. 2003) (quoting *Feldman v. Philadelphia Hous. Auth.*, 43 F.3d 823, 829 (3d Cir. 1994)).  Thus, "speech disclosing [a] public official['s] misfeasance is protected while speech intended to air personal grievances is not."  *Swineford v. Snyder Cnty.*, 15 F.3d 1258, 1271 (3d Cir. 1994).

The minutes of an April 3, 2012 borough council meeting reflect that, during the meeting, Officer Keller accused Defendant Halstead of lying to the public on multiple occasions and misusing her position as councilwoman to obtain GPS reports after she was instructed to stop monitoring the systems.  (Doc. 14-1, p. 6 of 7.)  These accusations clearly address matters of public concern as they seek to disclose potential breaches of public trust and misfeasance on the part of a public official and, therefore, Officer Keller's speech was protected.

However, although Officer Behne also asserts that he criticized members of the borough council at a public meeting, he has not pointed to any evidence regarding when the speech occurred or the specific content of the speech. Nor does he present evidence as to whether the speech was made with respect to his duties as a public official or as a private citizen.  While the evidence of record may support Officer Behne's contention that he engaged in protected speech, the court will not scour the record to find it.

### ii.     Right of Association

It also appears from the amended complaint that Plaintiffs allege that Defendants retaliated against them for their affiliation with the labor union, both due to their union membership and due to the protected speech of their union representative.  It is well-established that the First Amendment protects the right of a public employee to join and participate in a labor union.  *Guarnieri v. Duryea*

*Borough*, Civ. No. 3:05-cv-1422, 2007 WL 4085563, *15 (M.D. Pa. Nov. 15, 2007); *Day v. Borough of Carlisle,* Civ. No. 04–cv-1040, 2006 WL 1892711, *8 (M.D. Pa. Jul. 10, 2006) (citing *Thomas v. Collins*, 323 U.S. 516, 532 (1945)); *accord Morfin v. Albuquerque Public Sch.*, 906 F.2d 1434, 1438 (10th Cir. 1990).   Accordingly, Plaintiffs' association with the union is considered a protected activity.   However, whether the First Amendment also protects a public employee from retaliation for the speech of those with whom the employee shares a collective endeavor is not as well defined.

The First Amendment right to association has two distinct components. *Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984).   First, the right of intimate association encompasses the right to enter into and maintain certain close and intimate human relationships, such as family relationships.   *Pi Lamba Phi Fraternity, Inc. v. University of Pitt.*, 229 F.3d 435, 438 (3d Cir. 2000) (citing *U.S. Jaycees*, 468 U.S. at 617-18).   Second, the right to expressive association protects "the right to associate for purposes of engaging in those activities protected by the First Amendment – speech, assembly, petition for redress of grievances, and the exercise of religion." *U.S. Jaycees*, 468 U.S. at 618.   Courts that have previously addressed whether the First Amendment may be violated where the speech that invoked the government's retaliatory response was not made by the plaintiff himself but rather by a person in close relationship with the plaintiff have done so in the context of intimate associations.   In addressing the issue, these courts have consistently found that the First Amendment protects public employees against retaliation for the speech of those with whom they share intimate relationships.   *See, e.g., Adler v. Pataki*, 185 F.3d 35 (2d Cir. 1999) (holding that "retaliatory discharge

based solely on [protected speech] by one's spouse is actionable under the First Amendment"); *Lewis v. Eufaula City Bd. of Educ.*, 922 F. Supp. 2d 1291, 1303 (M.D. Ala. Dec. 4, 2012) (finding that plaintiff had raised a viable question of fact as to whether she was not rehired because of her association with her father and his speech)*; Talley v. Brentwood Union Free Sch. Dist.*, Civ. No. 08-790, 2009 WL 1797627, *6 (E.D.N.Y Jun. 24, 2009) (citing *Adler* to uphold claim of retaliation against daughter for father's speech); *Agostino v. Simpson*, Civ. No. 08-cv-5760, 2008 WL 4906140, *5 (S.D.N.Y. Nov. 17, 2008) (permitting First Amendment claim alleging that the defendants took adverse action against the plaintiff in retaliation for his father's protected activities); *Cain v. Tigard-Tualatin Sch. Dist.*, 262 F. Supp. 2d 1120, 1127 (D. Or. 2003) (upholding claim that the defendant's retaliatory conduct was motivated by the plaintiff's association with his parents' speech"); *Serena H. v. Kovarie*, 209 F. Supp. 2d 453, 458 (E.D. Pa. 2002) (permitting First Amendment claim that the plaintiff was retaliated against based upon her mother's exercise of free speech); *cf. Thompson v. North Am. Stainless, LP*, — U.S. — , 131 S.Ct. 863, 867 (2011) (concluding that if the plaintiff's allegation that the defendant terminated his employment in retaliation for his fiancee's filing of an EEOC charge was true, the defendant's firing of plaintiff violated Title VII).

    For instance, in *Adler*, 185 F.3d 35, the Second Circuit addressed whether a state employee's claim of retaliatory discharge based solely on the protected speech of his spouse is actionable under the First Amendment.  The court concluded that, "[t]hough the matter is not free from doubt, we think a spouse's claim that adverse action was taken solely against that spouse in retaliation for conduct of the other spouse should be analyzed as a claimed violation of a First

Amendment right of intimate association." *Id*. at 44.  The court explained, "[i]f the First Amendment accords an individual some right to maintain an intimate marital relationship free of undue state influence, Adler's claim properly invokes the protection of that Amendment." *Id*.

Likewise, in *Thompson*, 131 S.Ct. at 868, the Supreme Court found "it obvious that a reasonable worker might be dissuaded from engaging in protected activity if she knew that her fiancé would be fired." *Id*.   Though the Court was addressing the issue in a Title VII context, the Court's reasoning provides a useful analogy to the present case.  Citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006), the Court described Title VII's prohibition against retaliation as seeking to secure the primary objective of Title VII, which is a workplace free of "discrimination on the basis of race, color, religion, sex, and national origin," by prohibiting an employer from retaliating against an employee for the employee's efforts to secure or advance enforcement of the Act's basic guarantees.  *Thompson*, 131 S.Ct. at 868.  Reiterating that the anti-retaliation provision must be read broadly, the Court had little difficulty concluding that third-party reprisals, such as the firing of the speaker's fiancé, could violate Title VII.  *Id*.  Similarly, because the primary objective of the First Amendment is to ensure that "debate on public issues [is] uninhibited, robust, and wide-open," *Snyder v. Phelps*, — U.S. —, 131 S.Ct. 1207, 1215 (2011), the First Amendment has been understood to protect an employee who shares an intimate association with a person who engages in protected speech.  *See, e.g., Lewis*, 922 F. Supp. at 1304.

However, in the matter *sub judice*, Plaintiffs claim that governmental actors retaliated against them for the speech of their union representative.  Thus, the

right to expressive, rather than intimate, association is implicated.  Nevertheless, despite this distinction, it is logical that the protections afforded to those sharing an intimate association with the speaker also extend to those sharing an expressive association with the speaker.  Indeed, the First Amendment would be severely undermined if its protective ambit would not also encompass an employee who was retaliated against for his expressive association with a person who engaged in protected speech.

> As the Supreme Court explained in *U.S. Jaycees*:
>
> > An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed.  According protection to collective effort on behalf of shared goals is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority.  Consequently, we have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.

468 U.S. at 622 (internal citations omitted).  Permitting the government to freely retaliate against an employee for the protected speech of his expressive associate would chill free speech and eviscerate the protection afforded to such collective efforts.  Indeed, there is little doubt that a union representative might be dissuaded from advocating on behalf of union members if he knew that the members could be fired for his speech.  Likewise, an employee might be dissuaded from engaging in union activity if he knew the speech of his union representative could result in the

termination of his employment.  Accordingly, because the First Amendment protects the right of an individual to speak freely, to advocate ideas, and to associate with others, it must necessarily protect a plaintiff who was retaliated against for his expressive association with another person and that person's speech.

Of course, there are limits to the First Amendment's reach.  As the *Thompson* Court recognized,  "prohibiting reprisals against third parties will lead to difficult line-drawing problems concerning the types of relationships entitled to protection." *Id*.  However, rather than identify a fixed class of relationships for which third-party reprisals are unlawful, the Court instructed that "firing a close family member will almost always meet the . . . standard, and inflicting a milder reprisal on a mere acquaintance will almost never do so." *Id*.  Ultimately, "the significance of any given act of retaliation will often depend on the particular circumstances." *Id*.  In the present matter, the union representative was speaking directly on behalf of Plaintiffs on a matter that may have been protected if Plaintiffs had been speaking for themselves, and, thus, the court finds that, under these circumstances, terminating Plaintiffs' employment for the speech of their union representative would qualify as an unlawful third-party reprisal.  Consequently, Plaintiffs may have a viable First Amendment retaliation claim for their union representative's speech.

However, to support a First Amendment retaliation claim, Plaintiffs must also show that their union representative's speech can be fairly characterized as relating to a matter of public concern and that their interests as citizens outweigh the interests of the governmental entity as an employer.  The evidence is sufficient to find that Plaintiffs' representative's speech related to a matter of public concern.  The

union representative's speech at the April 3, 2012 borough council meeting involved serious accusations against Defendant Halstead, a borough council member, including, *inter alia*: that she was undermining the mayor; filing false reports to the FBI; and making false accusations about the police officers to the public. (Doc. 14-1, pp. 1-7.) Certainly, this speech addressed matters of public concern. Not only did the speech seek to bring to light wrongdoing by a public official, the representative spoke at a public meeting and incited public debate on the issue. Indeed, the record shows that the issues between the borough council and the police invoked heated debate at numerous borough council meetings. Furthermore, the matter divided both the board and the community, with some individuals expressing their allegiance with certain borough council members and others making it known in no uncertain terms that they wanted the accusations surrounding the police officers to stop.

As for the second element, that Plaintiffs' interests as citizens outweigh the interests of the governmental entity, the court cannot identify any interest the borough had in promoting the efficiency of the public services it provides that was jeopardized by the union representative's speech. Nor can the court identify any way in which the effectiveness of the borough's services was or could be hindered by the speech. Indeed, the speech sought to end the tension between certain members of the borough council and the police force. It therefore follows that, because the representative was speaking as a citizen on matters of public concern, and the borough did not have adequate justification for taking an adverse action against Plaintiffs for the speech, the speech is entitled to First Amendment protection.

**b.     <u>Causation</u>**

40

Although the Third Circuit has often noted that the first prong of a First Amendment retaliation claim presents questions of law for the court and the second prong presents questions of fact for the jury, only "*genuine* questions" of fact should be determined by the jury. *Hill,* 411 F.3d at 127 (emphasis in original). In this case, the officers have satisfied their evidentiary burden on the substantial factor prong of the inquiry.

Determining causation for a First Amendment retaliation claim involves an inquiry into the employer's motives and is highly context-specific. *See Kachmar v. Sungard Data Sys., Inc.*, 109 F.3d 173, 178 (3d Cir. 1997). The absence of immediacy does not necessarily disprove the causation factor of a prima facie case of First Amendment retaliation. *See Robinson v. S.E. Pa. Transp. Auth*, 982 F.2d 892, 894 (3d Cir. 1993) ("The mere passage of time is not legally conclusive proof against retaliation"). While "unusually suggestive" temporal proximity between the protected activity and the adverse action or a pattern of antagonistic conduct subsequent to the protected activity may be sufficient methods to establish causation in some matters, *see, e.g., Woodson v. Scott Paper Co.*, 109 F.3d 913, 920-21 (3d Cir. 1997) (finding sufficient causal connection based on "pattern of antagonism"); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (finding discharge of plaintiff two days after filing EEOC complaint to be sufficient to establish causation), they are not the exclusive methods to do so, *see Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000) (stating that Third Circuit "case law clearly has allowed a plaintiff to substantiate a causal connection for purposes of the prima facie case through other types of circumstantial evidence that support the inference"). The court may examine a "broad array" of evidence in determining whether a sufficient

41

causal link exists between the protected activity and the adverse employment action. *See id.* at 284; *see also Deflaminis*, 480 F.3d at 267.  A plaintiff can demonstrate, for instance, temporal proximity, intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence of record sufficient to support the inference of causality. *Farrell*, 206 F.3d at 279-81.  Indeed, it is causation, not temporal proximity or evidence of antagonism, that is an element of plaintiff's prima facie case.  *Id.* at 281. Temporal proximity and antagonism are merely avenues a plaintiff may take to establish an evidentiary basis from which an inference of causation can be drawn. *Kisner v. DeFazio*, Civ. No. 07-0788, 2009 WL 4891837, *1 (W.D. Pa. Dec. 16, 2009) (citing *Farrell*, 206 F.3d at 281).

        An analysis of the, albeit limited, record before the court creates inferences and provides corroborating evidence in support of Plaintiffs' contention that the police force was disbanded due to retaliatory animus.
For essentially the same reasons that a factfinder could infer that the police force was abolished in a concerted effort to circumvent the law in order to deprive Plaintiffs of their employment without due process of law, the factfinder could also infer that Defendants were motivated by Plaintiffs' union membership, by Officer Keller's protected speech, by the protected speech of Plaintiffs' union representative, or by Officer Behne filing an unfair labor practices claim against the borough.  That is, at the time Defendants abolished the police force, there seemingly was an ongoing rivalry between certain members of the borough council leading to Plaintiff Keller and the union representative making inciting accusations against at least one member of the borough council.  Moreover, the issues between the borough council and the

police officers seemed to escalate when Plaintiffs joined the union, as evidenced by the facts of record, including Defendant Fitzpatrick's testimony, Defendants' retention of a lawyer to help them deal with union matters, and the attorney billing statements showing a significant amount of time spent researching ways to abolish a police force when a union is involved. Significantly, prior to the disbandment, the individual defendants met with their attorneys to strategize ways in which to abolish the police force. This factual showing is more than enough to demonstrate causality and survive summary judgment.

However, Defendants may still prevail on their motion if they can show, by a preponderance of the evidence, that they would have reached the same decision even in the absence of the protected conduct. *Green,* 105 F.3d at 885. Defendants may meet this burden only by demonstrating that they would have taken the same action in any event. *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1075 (3d Cir. 1990). In the same manner in which they defended Plaintiffs' procedural due process claims, Defendants provide numerous financial statements and testimony of witnesses to show that the borough was in financial distress and had no other choice but to disband the police force. Plaintiffs argue that Defendants' rationale of financial hardship was a mere pretext for their action.

Although Defendants have demonstrated some financial distress, their position is undermined by their own proposition that they disbanded the police force as a "last-ditch" effort to cut expenses. Contrary to Defendants' assertions, the evidence, when viewed in a light most favorable to Plaintiffs, does not reflect a borough council that was burdened by financial concerns and strategizing ways to ameliorate the problem. Rather, the council's minutes reflect that the borough's

43

financial hardship was of no particular significance at most council meetings prior to the vote. Further, the evidence of record strongly suggests that the October 16, 2012 special council meeting was convened for the specific purpose of abolishing the police force, a proposition that carries with it a strong inference that motivations other than concern with the borough's limited financial resources were at work. Ultimately, the parties' arguments turn on issues of motivation and intent, and require consideration of competing testimony which will involve assessment of witness credibility. Thus, these competing reasons for the police department's disbandment cannot be resolved through a motion for summary judgment and must be determined at trial.

For all these reasons, to the extent that Defendants' motion for summary judgment addresses Plaintiffs' First Amendment claims of retaliation, the motion will be denied.

### C.    **Qualified Immunity**

Defendants argue, in the alternative, that they are entitled to summary judgment on the basis of qualified immunity. Resolution of this issue hinges on whether the rights allegedly violated by Defendants were clearly established in October 2012.

It is well-settled that "[t]he doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Schneyder v. Smith*, 653 F.3d 313, 318 (3d Cir. 2011) (quoting *Pearson v. Callahan*, 555 U.S. 223 (2009)). In addressing whether a right was clearly established in the law, the question before the court is whether "the state

of the law . . . gave [the defendants] fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).  Put another way, for a right to be clearly established, its "contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (citations omitted).  As the Third Circuit has explained:

> [D]efendants are entitled to qualified immunity if "reasonable officials in [their] position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be lawful."  Even where officials "clearly should have been aware of the governing legal principles, they are nevertheless entitled to immunity if[,] based on the information available to them[,] they could have believed their conduct would be consistent with those principles.

*Larsen v. Senate of Commw. of Pa.*, 154 F.3d 82, 87 (3d Cir. 1998) (citations omitted).

In order for the governing law to be sufficiently well established such that immunity should be denied, "it is not necessary that there have been a previous precedent directly on point ." *Rappa v. New Castle Cnty.*, 18 F.3d 1043, 1077 (3d Cir. 1994) (internal citations omitted).  Rather, "[t]he ultimate issue is whether, despite the absence of a case applying established principles to the same facts, reasonable officials in the defendants' position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be lawful." *Id*.  A plaintiff need not show a case directly on point, but may meet his burden by referencing closely analogous case law demonstrating that the allegedly violated constitutional or statutory right was clearly established when the alleged violation took place.  *See Brown v. Muhlenberg Twp.*, 269 F.3d 205, 211 n.4 (3d Cir.

2001) (stating that courts may look beyond binding precedent to detemine the state of the law at the time of the official's decision).  Whether the defendants in fact knew that they were violating the plaintiff's constitutional rights, however, is irrelevant to the analysis.  *Grant*, 98 F.3d at 123 (citing *Harlow*, 457 U.S. at 815-16).  Indeed, the qualified immunity analysis is based on an "objective legal reasonableness standard."  *Baylock v. City of Phila.*, 504 F.3d 405, 411 (3d Cir. 2007).  Although the facts known to the official at the time are relevant to the inquiry, the official's motivation in acting on those facts is not.  *Id*.

As discussed above, Plaintiffs had a clearly established property right in their employment.  *Dee*, 549 F.3d at 230; 53 P.S. § 46190.  Thus, the remaining inquiry regarding Plaintiffs' procedural due process claim is whether the individual defendants could have believed that their conduct was lawful in light of this clearly established constitutional right.  At the relevant time, the law pertaining to the proper procedure for disbanding a police force was clear, *see Donivan*, 835 F.2d at 489, yet the individual defendants deliberately bypassed that procedure.  A reasonable official should have known that the procedure by which the borough council disbanded the police force and correspondingly terminated Plaintiffs' employment without notice and a hearing violated the law.  Thus, immunity as to Plaintiffs' procedural due process claims must be denied.

Moreover, the general principle that the government cannot take adverse employment action in retaliation for protected speech is well established.  *See, e.g., Rankin v. McPherson*, 483 U.S. 378, 383 (1987) ("It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech.")  Likewise, the First

46

Amendment right of expressive association has long been recognized in many

decisions.  *See, e.g., Roberts*, 468 U.S. at 617-18; *Lewis*, 922 F. Supp. 2d at 1303.

Because the allegations underlying Plaintiffs' retaliation claims for violation of their

rights to speech and association go to the core protections of the First Amendment,

the violations, if true, are clear and Defendants are not entitled to qualified

immunity.[14]

However, Defendants further argue that, even if they violated clearly

established law, the individual defendants should still be granted qualified immunity

because they relied on advice of counsel in determining the procedure by which to

disband the police force.  *See Kincade v. City of Blue Springs, Mo.*, 64 F.3d 389, 399

(8th Cir. 1995) ("Reliance on the advice of counsel is a factor to be weighed in

assessing whether a public official is entitled to qualified immunity.").  However, at

this stage of the case, the record does not unequivocally support that Defendants are

entitled to rely on the advice of counsel defense.  There are factual issues remaining

as to whether complete information had been given to the attorneys, including the

individual defendants' motivation behind disbanding the police force.  *See V-1 Oil*

---

[14]  While the issue of whether the union representative's speech violated Plaintiffs' rights to expressive association is not well established, given that the rights underlying Plaintiffs' retaliation claim, *i.e.*, the rights to free speech and association, are fundamental to the First Amendment, the court cannot conclude that Defendants are entitled to qualified immunity on that issue.  Indeed, in analogous cases involving the right to intimate association, some courts have upheld First Amendment claims of retaliation for the speech of family members and entirely passed over the fact that the speech was not made by the plaintiff, apparently concluding that the issue did not merit discussion.  *See Lewis*, 922 F. Supp. at 1307 (citing *Ward v. Athens City Bd. of Educ.*, 1999 WL 623730 (6th Cir. 1999) (holding that "the impermissibility of retaliation is sufficiently well established that the defendants are not entitled to qualified immunity" and not discussing the legal implications of the protected speech being made by the mother rather than the plaintiffs); *Henley v. Tullahoma City Sch. Sys.*, 84 F. App'x 534, 539-40 (6th Cir. 2003)).  A government official's knowledge that retaliating against an employee for exercising his right to free speech or association is unlawful cannot be questioned.  With that knowledge, no reasonable official could think that he would be free to retaliate against an employee for his association with a union representative and that representative's exercise of free speech.  *See id.* at 1308.

*Co. v. State of Wyo.*, 902 F.2d 1482, 1488 (10th Cir. 1990) (instructing that, in determining whether a defendant is entitled to qualified immunity, a court should consider whether counsel had been given complete information about facts giving rise to the controversy).   Moreover, when viewed in the light most favorable to Plaintiffs, there is evidence to support a conclusion that the method by which the police force was disbanded and the alleged reliance on advice of counsel was pretext. The court will not grant judgment on an otherwise valid claim on the basis of a defense that requires the trier's weighing of the evidence and determination of reasonableness under the circumstances.

Finally, while Defendants have adamently argued that their actions in disbanding the police force were proper and lawful, a determination of this issue turns on motivation.   When confronting a claim of qualified immunity that is largely premised upon factual disputes regarding motivation, the court is reminded that, "[a]lthough qualified immunity is a question of law determined by the [c]ourt, when qualified immunity depends on disputed issues of fact, those issues must be determined by the jury." *Bartos*, 2011 WL 2456613 at *23 (quoting *Johnson v. Jones*, 515 U.S. 304, 313 (1995)); see *Karnes v. Skrutski*, 62 F.3d 485, 491 (3d Cir. 1995) ("While the qualified immunity defense is frequently determined by courts as a matter of law, a jury should decide disputed factual issues relevant to that determination.").   Thus, Defendant's assertion of qualified immunity is more properly an issue of fact that must be decided by a jury.

In sum, government officials reasonably apprised of the law and acting in good faith would, if acting as Plaintiffs allege, have had fair warning that their conduct was unconstitutional.   Moreover, the parties' factual dispute regarding

Defendants' motive in disbanding the police force must be decided by a jury. Consequently, the individual defendants are not entitled to qualified immunity, and Defendants' motion for summary judgment will be denied on this basis.

### D.    State Law Claims

Plaintiffs assert myriad state law claims against the borough and the individual defendants, including retaliation, slander, invasion of privacy, intentional infliction of emotional distress, civil conspiracy, and intentional interference with a contract.  Defendants move for summary judgment on these claims, arguing that: (1) Pennsylvania's Political Subdivision Tort Claims Act shields both the borough and the individual defendants from exposure to liability; (2) Defendant Council Members are entitled to absolute immunity under Pennsylvania's Doctrine of High Public Immunity; and (3) they are entitled to judgment in their favor because Plaintiffs' claims are precluded by the statute of limitations or fail to raise genuine issues of material fact.  The court will address each argument in turn.

### 1.    Pennsylvania's Political Subdivision Tort Claims Act

The Pennsylvania Political Subdivision Tort Claims Act  ("PTSCA"), 42 Pa.C.S.A. § 8541, grants broad immunity to municipalities against intentional conduct suits, providing: "Except as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person."  42 Pa.C.S.A. § 8541; *Weaver v. Franklin Cnty.*, 918 A.2d 194, 200 (Pa. Commw. Ct. 2007) (dismissing intentional tort claims against the county defendant). The Code defines "local agency" to include "[a] government unit other than the Commonwealth government."  42 Pa.C.SA. § 8501.  The PTSCA creates eight

narrow exceptions to this immunity, none of which are applicable in the instant case.[15]  *See* Pa.C.S.A. § 8542(b).

Pursuant to the PSTCA, an employee of a local agency has immunity if: (1) the local agency has immunity under Section 8541, and (2) the employee was acting within the scope of his office or duties when he engaged in the alleged conduct.  *Hellyer v. County of Bucks*, Civ. No. 10-2724, 2014 WL 413874, *9 (E.D. Pa. Jan. 31, 2014).  However, immunity does not attach when the official's act "constituted a crime, actual fraud, actual malice or willful misconduct."  42 Pa.C.S.A. § 8550.  Proof of conduct which abrogates immunity under the PTSCA requires a "demanding level of fault."  *Hellyer*, 2014 WL 413874 at *9 (quoting *Sanford v. Stiles*, 456 F.3d 298, 315 (3d Cir. 2006)).

### a.    Defendant Borough of Newport

The allegations in Plaintiffs' complaint do not satisfy any of the narrow exceptions delineated in Section 8542(b), and Section 8550 "jettisons only those immunities held by municipal employees and only then for forms of willful misconduct.  This section does not, however, abrogate the general retention of municipal immunity."  *Id.* (quoting *Travis v. Deshiel*, 832 F. Supp. 2d 449, 455 n.3 (E.D. Pa. June 9, 2011)).  Accordingly, the Borough of Newport is entitled to immunity from suit on Counts VII-X and XII-XV of the amended complaint.

---

[15]  The statute provides that "acts by a local agency or any of its employees may result in the imposition of liability on a local agency" if they fall within one of eight specific categories: "(1) Vehicle liability; (2) Care, custody or control of personal property; (3) Real property; (4) Trees, traffic controls and street lighting; (5) Utility service facilities; (6) Streets; (7) Sidewalks; and (8) Care, custody or control of animals."  42 Pa.C.S.A. § 8542(b).

### b.     Defendant Council Members

As noted above, ordinarily, an individual employee would also be immune under the PSTCA to the same degree as the Borough of Newport for actions taken within the scope of his employment.  *Alex v. Northumberland Cnty. Prison*, Civ. No. 1:cv-04-1913, 2005 WL 2315452, *4 (M.D. Pa. Sept. 22, 2005).   However, if it is judicially determined that the act of the employee caused the injury and that such conduct amounted to willful misconduct, the employee can be liable for damages.  *See id.*  Under the PTSCA, "willful misconduct" is synonymous with "intentional tort," meaning "conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied."  *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 287 (3d Cir. 2006) (quoting *Robbins v. Cumberland Cnty. Children & Youth Servs.*, 802 A.2d 1239, 1253-54 (Pa. Commw. Ct. 2002)); *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 214 (3d Cir. 2001).  The Third Circuit has made clear that willful misconduct lies beyond recklessness, deliberate indifference, and the knowing disregard of risks; instead, it requires "specific intent."  *Id.*

In the instant matter, Plaintiffs have presented sufficient evidence to raise a triable issue as to whether Defendant Council Members' actions in regard to disbanding the police force and terminating Plaintiffs' employment amounted to willful misconduct.[16]  Under the circumstances present in this case, the court cannot conclude as a matter of law that Defendant Council Members' are entitled to immunity under the PTSCA.

---

[16]  As the evidence involving Defendant Council Members' actions has been discussed at length above, the court finds it unnecessary to reiterate it here.

## 2.   **Doctrine of High Public Official Immunity**

Defendant Council Members also assert that they are entitled to absolute immunity under the common law doctrine of absolute privilege for high public officials.  *See Smith v. School Dist. of Phila.*, 112 F. Supp. 2d 417, 425 (E.D. Pa. 2000).  In *Durham v. McElynn*, 772 A.2d 68 (Pa. 2001), the Pennsylvania Supreme Court confirmed that this doctrine remains the law in the state and explained the scope of its immunity as follows:

> [A]bsolute privilege . . . is unlimited, and exempts a high public official from all civil suits for damages arising out of false defamatory statements and even from statements or actions motivated by malice, provided the statements are made or the actions are taken in the course of the official's duties or powers and within the scope of his authority . . . .

772 A.2d at 69.

Although the doctrine originated in defamation suits, the Pennsylvania Supreme Court has extended it beyond the defamation context so long as the actions were taken within the scope of the official's authority.  *Jonnet v. Bodick*, 244 A.2d 751, 753 (Pa. 1968).  Consequently, the doctrine has been spread to other tort actions, including retaliation, invasion of privacy, and intentional infliction of emotional distress.  *See Zugarek v. Southern Tioga Sch. Dist.*, 214 F. Supp. 2d 468, 479 (M.D. Pa. 2002).  In addition, the PTSCA, which sets forth circumstances where official immunity can be waived, does not abrogate the privilege of a high public official immunity from suit.  *Osiris*, 877 A.2d at 566.

While the grant of an absolute privilege serves the practical function of protecting high public officials from the "expense, publicity, and danger of defending the good faith of [their] actions before the jury," it also serves the "deeper purpose [of protecting] society's interest in the unfettered discharge of public

business and in full public knowledge of the facts and conduct of such business."
*Montgomery v. City of Phila.*, 140 A.2d 100, 103 (Pa. 1958).  However, the pitfalls
to this doctrine are obvious and Pennsylvania courts have recognized that there are
valid arguments against permitting public officials absolute immunity from liability.
*Osiris Enters. v. Borough of Whitehall*, 877 A.2d 560, 566, n.11 (Pa. Commw. Ct.
2005).  Thus, in an effort to balance societal interests in encouraging full and
uninhibited participation by public officials in public business against the possibility
that an individual may suffer irreparable harm due to the actions of a public official,
courts have concluded that only high public officials should be entitled to claim
absolute privilege as a defense.  *See id.* at 566-67 (citing *Montgomery*, 140 A.2d at
102); *Hall v. Kiger*, 795 A.2d 497, 499-500 (Pa. Commw. Ct. 2002) (seeking to
balance societal interests against the interests individuals have in protecting their
reputations from false representations by public officials).  "An official's status as a
high public official for purposes of absolute immunity is determined on a case-by-
case basis, and depends on the nature of his duties, the importance of his office, and
particularly whether . . . he has policy-making functions." *Zugarek*, 214 F. Supp. 2d
at 479.  In *Hall*, the Pennsylvania Commonwealth Court held that, because the duties
conferred upon borough council members necessitate the exercise of both legislative
and policy-making powers, borough council members are high public officials
entitled to raise the defense of absolute privilege from suit.  *Hall,* 795 A.2d at 500;
*Smith v. Borough of Dunmore*, 633 F.3d 176, 181-82 (3d Cir. 2011) (finding that
high public official immunity shields council members from any claim for
defamation)*; Osiris*, 877 A.2d at 567 (concluding that council members are high

public officials).  Thus, Defendant Council Members qualify as high public officials under Pennsylvania law.

Next, the court must consider whether Defendant Council Members' allegedly actionable behavior was made within the scope of their official authority, or whether they exceeded their authority making unavailable their claim of absolute privilege.  In *McCormick v. Spector*, 275 A.2d 688 (Pa. Super. Ct. 1971), the Pennsylvania Superior Court emphasized that it is the public's interest rather than the interest of the official that supports the establishment of absolute immunity and explained that, "given the great potential for harm, the privilege must be limited to those statements and actions which are in fact 'closely related' to the performance of those official duties." *Id.* at 689.

Defendant Counsel Members' alleged actions in this case all stem from and pertain to their positions as council members.  The crux of this case involves the actions leading up to, culminating in, and resulting from the decision to disband the police force and terminate Plaintiffs' positions.  For purposes of high official immunity, disbanding a police force is within the scope of a borough council's duties.  Consequently, the court is constrained to find that Defendant Council Members' actions fall within the scope of absolute privilege, rendering them absolutely immune from state civil suits claiming damages in regard to those actions.[17]

---

[17]  The court's conclusion in this instance has no bearing on its finding that, with regard to Plaintiffs' federal actions, absolute legislative immunity is not available to bar Plaintiffs' Section 1983 claims because Defendants' vote constituted an administrative act as opposed to a legislative act.  The doctrines of absolute legislative immunity and high public official immunity arise under different circumstances and the doctrine of high public official immunity is broader than that of federal legislative immunity in that it encompasses any act, whether legislative or administrative, within the scope of the

(continued...)

### 3.   Defendant Fitzpatrick

Having found that the Borough of Newport and Defendant Council Members are absolutely immune from suit with regard to the state law claims, Defendant Fitzpatrick remains as the sole defendant in the state actions.[18]  Plaintiffs assert against him claims for slander, retaliation, civil conspiracy, intentional interference with an employment contract, and intentional infliction of emotional distress.  The court will address each claim as it applies to Defendant Fitzpatrick in turn.

### a.   Slander

Plaintiffs have failed to provide sufficient evidence to move forward with a slander claim against Defendant Fitzpatrick.  Indeed, Officer Keller has not presented a single specific instance wherein he was allegedly slandered by Defendant Fitzpatrick.  Insofar as Officer Behne has alleged that Defendant Fitzpatrick made slanderous statements about him in or around August 2011, the action is barred by the applicable one year statute of limitations, 42 Pa.C.S.A. § 5523, as Plaintiffs filed their complaint on January 8, 2013 (Doc. 1).  Therefore, Defendants' motion for summary judgment as to Plaintiffs' slander claims will be granted.

### b.   Retaliation

---

[17](...continued)
official's duties.

[18]  Although the evidence of record supports a finding that Defendant Fitzpatrick remained an integral part of the borough council despite the conclusion of his tenure as a council member, and thus he could be regarded as a state actor for purposes of the Section 1983 actions, the court will not consider him a high public official for purposes of state immunity as that status is reserved for the select few in office.  While the implications here may appear contradictory, the purposes behind enabling someone to be considered a state actor yet denying them state immunity are fundamentally different.

Counts VII and VIII of the amended complaint allege that Defendant Fitzpatrick retaliated against Plaintiffs and acted in violation of the public policy of Pennsylvania as set forth in *Shick v. Shirey*, 716 A.2d 1231 (Pa. 1998). Plaintiffs' reliance on *Shick* is misplaced. The court in *Shick* held that "termination of an at-will employee for filing a workers' compensation claim violates public policy." 716 A.2d at 1237. In so holding, the court recognized a public policy exception to the "at-will" doctrine, which generally gives an employer the ability to "discharge an employee with or without cause, at pleasure, unless restrained by some contract," or unless contrary to statutory law. *Id*. at 1233. Plaintiffs were not at-will employees and, thus, the holding of *Shick* neither addresses nor controls the issues in this case. Moreover, Plaintiffs have not cited, and the court has not independently found, any Pennsylvania appellate cases recognizing a common law cause of action for retaliation based on anything other than wrongful discharge. *See Hoshak v. Sysco Food Servs. of Pitt., LLC*, No. 2:06cv176, 2008 WL 2944609, *7 (W.D. Pa. Jul. 28, 2008) (stating same). A cause of action for a wrongful discharge necessitates action by the employer, and Defendant Fitzpatrick, while perhaps an instigator, was not Plaintiffs' employer. Finally, even if a claim could be asserted against Defendant Fitzpatrick, it would be precluded by the existence of a collective bargaining agreement. *See, e.g.*, *Phillips v. Babcock & Wilcox*, 503 A.2d 36, 38 (Pa. Super. Ct. 1986) (holding that an employee could not maintain a wrongful discharge claim for retaliation based on the filing of a workers' compensation claim where the employment relationship was not at-will and was instead covered by a collective bargaining agreement). Accordingly, judgment will be granted for Defendant Fitzpatrick on Counts VII and VIII.

56

### c.   Civil Conspiracy

Plaintiffs also allege that Defendant Fitzpatrick conspired to violate their constitutional rights.  Under Pennsylvania law, the essential elements of a claim of civil conspiracy are as follows: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose[;] (2) an overt act done in pursuance of the common purpose[;] and (3) actual legal damage."  *Phillips v. Selig*, 959 A.2d 420, 437 (Pa. Super. Ct. 2008).  Proof of malice or an intent to injure is essential to the proof of a conspiracy.  *Commonwealth v. Tap Pharma. Prod., Inc*., 36 A.3d 1112, 1144 (Pa. Commw. Ct. 2011).  "This unlawful intent must be absent justification." *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979).

In *Thompson Coal*, the Pennsylvania Supreme Court explained the requisite intent, absent justification, as follows:

> Assume that what is done is intentional, and that it is calculated to do harm to others.  Then comes the question, Was it done with or without "just cause or excuse"?  If it was bona fide done in the use of a man's own property such legal justification would exist[,] not the less because what was done might seem to others to be selfish or unreasonable.  But such legal justification would not exist when the act was merely done with the intention of causing temporal harm, without reference to one's own lawful gain, or the lawful enjoyment of one's own rights.

In the instant case, the court finds that there is a question of material fact as to whether Defendant Fitzpatrick, without reference to his own lawful gain, acted with malice or an intent to injure Plaintiffs.  Indeed, the record indicates that Defendant Fitzpatrick was annoyed at Plaintiffs' union membership and consequently retained Attorney Miller, that he met with several council members in private regarding disbanding the police force, and that he threatened to have Officer

Keller fired if he did not assist the council in terminating Officer Behne or if he removed the GPS systems from the police vehicles.  In addition, Defendant Fitzpatrick made several disparaging remarks about Officer Behne in August 2011 which could provide further evidence of malice.  Consequently, summary judgment for Defendant Fitzpatrick on Counts XIV and XV is not appropriate, and Defendants' motion in this regard will be denied.

### d.    Intentional Interference With an Employment Contract

In order to maintain a claim for intentional interference with an employment contract, the plaintiff must demonstrate the following: "(1) the existence of a contractual relationship; (2) an intent on the part of the [defendant] to harm the plaintiffs by interfering with that contractual relationship; (3) the absence of a privilege or justification for such interference; and (4) damages resulting from the defendant's conduct." *Triffin v. Janssen*, 626 A.2d 571, 574 (Pa. Super. Ct. 1993). To succeed on this claim, the plaintiff must prove that the defendant acted for the specific purpose of causing harm to the contractual relationship at issue. *Glenn v. Point Park College*, 272 A.2d 895, 897 (Pa. 1971).  Here, Plaintiffs have presented evidence indicating that Defendant Fitzpatrick intended to interfere with their contractual relationship, including his retention of Attorney Miller, his participation in meetings regarding the potential disbandment, and his own testimony.  Thus, Plaintiffs have put forth sufficient evidence to warrant submitting the issue to the jury.  Defendant Fitzpatrick is not entitled to summary judgment on this claim, and Defendants' motion in this regard will be denied.

### e.    Intentional Infliction of Emotional Distress

In order to prevail on a claim of intentional infliction of emotional distress, the plaintiff must demonstrate that "(1) a person who by extreme and outrageous conduct (2) intentionally or recklessly cause[d] (3) severe emotional distress to another." *Manley v. Fitzgerald*, 997 A.2d 1235, 1241 (Pa. Commw. Ct. 2010). Here, the conduct complained of does not rise to the requisite level of "extreme and outrageous" and the harm alleged falls short of "severe emotional distress." Moreover, Plaintiffs cannot succeed on their claims of intentional infliction of emotional distress because they have not produced competent medical evidence of injury. *Kazatsky v. King David Mem'l Park, Inc.*, 527 A.2d 988, 995 (1987) (requiring "at the very least, [the] existence of the alleged emotional distress [to] be supported by competent medical evidence"). Therefore, the court will grant Defendants' motion for summary judgment as to Plaintiffs' intentional infliction of emotional distress claims.

IV.       **Conclusion**

For the foregoing reasons, the court finds that there are genuine issues of material fact remaining as to Plaintiffs' due process and retaliation claims against all of the defendants in this action. In addition, the court finds that the record fails to demonstrate that Defendants are entitled to judgment as a matter of law on Plaintiffs' state law claims of civil conspiracy and intentional interference with an employment contract against Defendant Fitzpatrick. Accordingly, Defendants' motion for summary judgment will be granted in part and denied in part.

An appropriate order will issue.

s/Sylvia H. Rambo
United States District Judge

Dated:  April 29, 2014.